the interests of the general body of the bankrupt's creditors, or fair suggestion of considerations of supposed hardship to her creditors. The hardship seems to be rather on the other side. If she chose to suffer herself to be involved in debts incurred in carrying on his business in order to cover it against his former creditors, those former creditors ought not, for this reason, to be postponed in the distribution of his funds to other creditors whose debts may have been afterwards contracted in her name. To what extent, if to any, her liabilities to the creditors to whom she died indebted were thus contracted, is, upon the proofs before us, altogether conjectural. On the distribution by the orphans' court of the estate called hers, these creditors have, since her death, received nearly $2,000 from proceeds of personal property of the establishment, in which, as I have said, no capital of her own appears to have been invested, and which, in truth, was not hers, but the bankrupt's. Upon a distribution of the same fund by this court in bankruptcy, the same creditors would not thus have received the whole of it. The most favorable view for them would have been to consider their demands against her as equitable debts of the bankrupt. Such of these debts as might appear to have been truly contracted in the course of the business conducted by him in her name, for his own benefit, would perhaps have been so considered, and, if so, would have been entitled to a dividend; but in such a dividend his other creditors would participate equally. So far as the parties to whom distribution was awarded by the orphans' court may have been distinctively her own creditors, they would have been excluded by this court from even a dividend. All such considerations of hardship, or of supposed equities and counter equities, are, however, out of place. They could not be entertained without a perversion of those principles of the law of debtor and creditor of which the application has been shown. The assignee does not appear to have as yet taken possession of the property, though it is not easy to surmise by whom, or for whom, possession, if demanded, could have been withheld from him. It certainly could not have been withheld by the bankrupt for himself, or for Price, or for the representatives of his aunt, nor does the assignee, though he seems to consider the possession withheld from him, appear to have instituted proceedings in equity, or at law, to recover it. Of this apparent remissness there may possibly be some explanation in the want of funds, and the unwillingness of parties interested to supply them. If so, whether the explanation suffices to excuse the assignee or not, the danger incurred by the bankrupt is increased, because the twenty-ninth section of the act of congress prohibits his discharge if he has been guilty of any fraud or negligence in the delivery to the assignee of

property which ought to be available for the benefit of the creditors.

Heretofore the attitude of this bankrupt has, to all appearance, been that of hostility to his acknowledged creditors,—a hostility always unbecoming a debtor, but most especially unbecoming where, in asking a discharge, he alleges that he has absolutely no assets. Perhaps, however, this may not have been his true attitude. The appearance of it may possibly have been unavoidable from the course of the proceedings. It is to be hoped that he will, without further delay, promote the just interests of his creditors by placing the assignee in possession, and facilitating a profitable disposal by him of the property, including the good will, etc., of the business, and by accounting to him fairly for any money, etc., on hand, and credits outstanding at the commencement of the proceedings, and for all subsequent profits. If he shall do so, the question to be decided, in a future stage of the proceedings, may be whether all claim to a discharge has, for the causes of objection heretofore specified, been already forfeited so absolutely that a discharge cannot hereafter be granted.

As at present advised, if I were finally to decide the case upon the present evidence, I would refuse a discharge; but whether it is too late for him to retrieve himself by adopting the course which I have indicated is a point which may, perhaps, be reserved. I think that the proceedings have not reached the stage in which his creditors can be required to abide by the objections to his discharge which have been specified. The reason is that there had not been a sufficient examination or disclosure before the time appointed for a hearing in court upon his application for a discharge. Unless the counsel of the creditors desire to be heard on the fourth point, the case will be recommitted.

Neither the assignee nor any creditor urging an immediate final decision, this point was not argued; and the case was recommitted to the register.

## Case No. 8,478.

### In re LONG.

[9 N. Y. Leg. Obs. 73; 3 Am. Law J. (U. S.) 294; 8 Leg. Int. 10.]

District Court, S. D. New York. Jan. 8, 1851.

FUGITIVE SLAVE LAW—CONSTITUTIONALITY.

1. The act of 16th September, 1850 [9 Stat. 462], is constitutional, valid, and binding.

2. Examination of evidence as to identity of fugitive.

In the matter of Henry Long, claimed as a fugitive from service.

J. L. White and John Jay, for Long.

Geo. Wood, N. M. Western, and the United States District Attorney, for claimant.

JUDSON, District Judge. This proceeding has been brought into court in pursuance of

the act of congress of February 12, 1793 [1 Stat. 302], and an amendment of Sept. 16, 1850 [9 Stat. 462]. J. S. Smith, the claimant, is a resident of Virginia, and claims the restoration of Henry as a fugitive from his service. To reclaim to that service he has, under a valid power of attorney, caused the arrest of Henry by his authorized agent and attorney. An affidavit having been filed in court, a warrant issued, and the arrest made, Henry is now in custody of the marshal of this district, awaiting the determination of this matter. No questions have been raised in regard to the form or validity of the papers in the case. The claimant has produced his evidence in support of that claim; and the alleged fugitive, by his counsel, has produced such evidence as the counsel deemed proper, all of which has been heard and considered. Counsel, learned in the law, have discussed with great ability the questions involved in the case. And now it devolves on the court to decide these questions according to law and evidence. However important a cause may be to the public or an individual, no other rule can ever be adopted in the administration of justice. If evidence is to be weighed that must be done in even scales. If the law is to be interpreted, there must be no departure from the long established rules belonging to the code of the civilized world.

Before stating the question now to be determined, it may be proper to remark that, in the argument of the case, the learned counsel for the defence, who last addressed the court, did, with great frankness and candor, admit that the law of congress of Sept. 16, 1850, by virtue of which this case is now proceeding in the circuit court of the United States, is in no manner inconsistent with the provisions of the constitution. Or in other words, so far as this court and this cause are concerned, this law is constitutional, valid and binding. To this admission it may well be added that every judge of every court in the United States, having taken upon himself the oath to support the constitution, can by no possibility fail in the performance of that duty whenever a case falling within the law, supported by competent proof, is brought before him. To do otherwise would be a violation of known duty and a prostration of all laws, never to be required of any judge by a single individual of that community in which he may be called to act. These considerations and this admission supersede all necessity of discussing either the constitutionality of the law or its power over this court.

What remains then to be done in the present case? It is simply to inquire: 1st. Does Henry Long by the laws of Virginia owe service and labor to John T. Smith, the claimant? And, 2d, is Henry Long a fugitive from that service within the meaning and intent of the second section of the 4th article of the constitution of the United States, and within the meaning of the act of congress above

mentioned. These questions of fact comprehend all that the court has to determine. The case is therefore brought down to a very narrow point; the common sense construction and weight of evidence may be alluded to as furnishing a guide for the mind. The means of knowledge, the integrity and standing of witnesses, the probability of the story related, the liability to mistake as to time, facts or circumstances connected with the case, these are all to be taken into the account in giving effect to the terminating of the case. To return to the first question, does the person arrested, according to the laws of Virginia, owe service and labor to the claimant? By the laws of Virginia slavery is tolerated. The constitution of the United States yields its sanction to that law, and since the organization of the government, the supreme court of the United States, in its numerous decisions, have upheld the right; therefore, no subordinate tribunals can now call it in question. In point of fact, then, how stands the case and the proof in regard to the person claimed? Dr. Wade, a citizen of Virginia, an intelligent witness, speaks of his own knowledge to this court, bearing testimony that Henry was born in his own immediate neighborhood, in the town of Christianburgh, Virginia; that his mother was a slave, owned by Mr. Anderson; that they were brought up together as boys and men; that he has always known him, and seen him in service as a slave; that this claimant married the daughter of Mr. Anderson; that after the death of Mr. Anderson, the mother and son passed into the hands of this claimant; and this witness adds, that he has now met Henry in New York, and in conversation with him, and in seeing him here in court, he knows him to be the same person, and positively swears to his identity as he would to his own brother. Dr. Wm. Parker, another citizen of Virginia, testifies that heretofore he has been in the habit of visiting John T. Smith, his brother-in-law, in Russell county, Virginia, and saw there in service as a slave the person here arrested; that at the instance and request of Smith, and as his agent, this witness had the letting of Henry in Richmond, Va., to the house of Haskins & Libby, as the slave of this claimant, and collected the wages, transmitting the same to his brother-in-law, Smith; that while so in service in Richmond, Henry was sick, more than once; and that he was his physician, attending him while sick, and sat up with him through the night; that at the request of Henry, he wrote to Henry's wife and master in Russell county. Two witnesses, masters of vessels sailing between the ports of New York and Richmond, have also testified that they have frequently seen this man at work in the store of Haskins & Libby during the time stated by Dr. Parker; that since that time they have seen him in this city, and seeing him here in court, identify him as the same individual.

The second question is, has Henry Long es-

caped from the service of John T. Smith? Dr. Parker testified that in Dec., 1848, Henry left Richmond; that he advertised him; that with diligent inquiry he could not be found there; and that since that time he has been found in New York. On the part of the claimant, it is insisted that this evidence should be deemed satisfactory proof, competent in law. On the other hand, the counsel for defence have introduced four witnesses, who testify that they saw Henry in the city of New York in November and December, 1847, January 24, 1848, and from that time down to the present. It is claimed on the part of the defence, that the alleged fugitive was not in Richmond at the time sworn to by Dr. Parker and the two ship masters. There is no necessary contradiction between the witnesses thus introduced. They only differ as to time. There is no doubt that these four witnesses have seen Henry Long in N. York, but as to the precise time they may be mistaken, and have substituted the year 1848 for 1849. For instance, the paper which bears date January 24, 1848, was undoubtedly written in 1849, for the witness declares that her father-in-law sailed for California in a particular ship which sailed in January, 1848, as she swears; when, in point of fact, the ship sailed in January, 1849. Then, as to the testimony of John Butler, he testifies that he saw Henry frequently; that Henry was a constant driver of a carriage from a particular street named by him; and that he often met him at a blacksmith's shop in Centre street. One of these witnesses testifies that Henry was a waiter at an hotel in New York; another one that he saw Henry with his waiter's garb and dress on board the Vanderbilt, all in the year 1848. If these things actually occurred in 1848, it would be an easy matter for Henry to inform his counsel where lived the owner of this coach he drove so long, whose was the hotel in which he waited, and who was the captain of the Vanderbilt in 1848, for whom he served; they would all have been here. This omission goes far to show that there may have been a mistake as to the precise time when Henry was first seen in New York, and an honest mistake too.

There is another remarkable omission which characterizes the defence. Are there two Henry Longs? I have heard of no such pretence, and if there be but one Henry Long, the question naturally presents itself here, is this man now present the Henry Long of Virginia, or is he Henry Long of New York? And if this latter, why are not his parents, his brothers, his sisters, his neighbors, his boyhood acquaintances, here to identify him, instead of John Butler? They would all rush to the court room, and tell us that this man is the Henry Long of New York, and a free man. This aspect of the case is one of singular importance.

These considerations lead the court to the inevitable conclusion that there is no real contradiction arising out of the evidence of the case, and that the two great questions of fact involved in the controversy are maintained upon satisfactory proofs competent in law. The consequence is that a certificate in conformity to the act of congress be now issued by the clerk of this court, for the surrender of Henry Long, as a fugitive from service and labor.

---

## Case No. 8,479.

### LONG v. CONNER.

[17 N. B. R. 540.] [1]

Circuit Court, S. D. New York. Dec. 5, 1877.[2]

BANKRUPTCY—ATTACHMENT BY SHERIFF—NOTICE OF BANKRUPTCY—LIABILITY TO ASSIGNEE—VALUE OF PROPERTY—JUDGMENT AGAINST ATTACHING CREDITOR.

1. A creditor began suit in the supreme court of New York against one Spaulding, and obtained from the court a warrant of attachment against the property of said Spaulding, as a non-resident, under which warrant the sheriff levied upon certain goods of Spaulding in New York; three days after the levy, an involuntary petition in bankruptcy was filed against Spaulding, in Massachusetts; thereafter, but before any adjudication, and before the election of any assignee in the bankruptcy proceedings, and before the sheriff had notice of such proceedings, an order for the sale of the goods, as perishable, was obtained from the state court, and the sheriff sold the goods under the said order; *Held,* that the sheriff was guilty of conversion in selling the goods, and was liable in damages to the assignee in bankruptcy subsequently appointed.

2. Where goods are held by a sheriff under an attachment under mesne process of less than four months' standing at the time of the filing of a petition in bankruptcy, the title of the assignee in bankruptcy subsequently appointed relates to the date of the filing of the petition, and dissolves the attachment and invalidates all proceedings under it subsequent to the filing of the petition, even though such proceedings be taken without notice of the bankruptcy.

3. An order by the state court, in the attachment suit, for the sale of the goods attached as perishable, is no protection to the sheriff, when such order is made after the filing of the petition in bankruptcy, though before adjudication.

4. The sheriff is liable to the assignee in bankruptcy for the true market value of the property on the day of the sale, and not merely for the amount realized at the sale.

5. In order to determine what was the market value, the jury can consider fair sales made at or about the time, or within a reasonable time subsequently.

6. The amount received at the sheriff's sale furnishes some evidence of value; but the jury are to consider that this may have been a forced sale; where no great length of time or great amount of advertising or notice to the general public was given, the jury are to determine whether this was a fair criterion of the actual market value.

7. The market value of the property, rather than any injury over and above the market value which the assignee or the original owner might have suffered, is the measure of damages.

8. The fact that the assignee in bankruptcy has already obtained judgment against the attachment creditor in a suit for damages for the same conversion, and has issued execution on the judgment, is no defense to a suit against the sheriff;

1 [Reprinted by permission.]
2 [Reversed in 104 U. S. 228.]